THE TOWNSHIP OF DOVER, IN THE COUNTY OF OCEAN, PROSECUTOR, v. THE TOWNSHIP OF BRICK, IN SAID COUNTY, ET AL., DEFENDANTS.

Submitted January 30, 1931—Decided May 5, 1931.

Before Justices PARKER, CAMPBELL and BODINE.

For the prosecutor, *Russell G. Conover.*

For the defendants, *Ira F. Smith.*

The opinion of the court was delivered by

PARKER, J. It would be a comparatively short matter to dispose of this case wholly on technical grounds, but as it involves questions of territorial jurisdiction and resultant questions of the right of taxation of lands, which once deemed worthless, have now become valuable, we regard it as important to express our views on the merits of the matter.

The fundamental question involved relates to the correct location of the boundary line between the townships of Dover on the south, and Brick on the north, in the county of Ocean, from the point where it strikes the south branch of Kettle Creek, on the west side of Barnegat Bay and runs eastwardly to the ocean, crossing the sandspit at a point some three miles

south of Mantoloking. In this neighborhood are situted the twin settlements called Normandy Harbor, fronting westerly on the bay, and Normandy Beach, fronting eastwardly on the ocean. Both Dover and Brick townships claimed the right to tax them; and to settle the boundary line, the township committee of Brick township applied to the Court of Common Pleas, pursuant to the provisions of Article VIII of the Municipalities act of 1917 (*Pamph. L., p. 341, et seq.*) for the appointment of a commission, which was accordingly appointed, held its hearings and made a determination, which, with the proceedings bearing thereon, is brought up by this writ.

It may be well at this point to dispose of a constitutional question raised by counsel for prosecutor. His point, in brief, is that the power sought to be exercised under Article VIII is a legislative power and cannot be delegated. We may concede for present purposes that a legislative power to delimit the boundaries of a municipality cannot be delegated; but we do not agree that the power granted by the act in question is a legislative power; on the contrary it is a judicial or *quasi*-judicial power. The language of the act is: "for the appointment of three commissioners to fix, determine and monument said boundary line between said municipalities, which line, when finally fixed, determined and monumented, shall remain inviolate." This does not appear to us to differ in substance from the older statutes bearing on the matter. *Pat.* 295; *Rev.* 1877, *pp.* 211, 212; *Comp. Slat., p.* 1685. By these, in the case of counties, the Supreme Court, on application, is to appoint commissioners to "run, survey, mark and ascertain the said line," &c. The same language is used in the case of townships. *Comp. Stat., p.* 1686, §§ 7, 8 and 9. The language of the Municipalities act seems to be taken from the first section of "An act to settle disputed boundaries between adjoining cities of this state." *Pamph. L.* 1889, *p.* 46; *Comp. Stat., pp.* 591, 592. This, as well as paragraph 1 of Article VIII of the Municipalities act, begins: "Whenever there is a dispute or uncertainty concerning the true boundary line," &c., and uses

the language "fix, determine and monument." This language, taken with its context looking toward the settlement of a dispute about the true location (which will be found also in the old county and township act of 1798—*Pat.* 294, 295), we regard as identical in purport with that of the old act, and as calling for a judicial, and not a legislative, fixation of such boundary. Consequently, if in the present case the commissioners had determined the matter judicially, their finding would be invulnerable from a constitutional standpoint. In fact they began correctly but strayed from the true path at the end.

The question before them for judicial solution was one to be answered conformably to the act of 1850 (*Pamph. L., p.* 73), reprinted in *Comp. Stat., pp.* 1690, 1691, section 3 of which describes the township of Brick which was carved out of the townships of Howell and Dover, as beginning at the mouth of Manasquan river and running westerly and southerly on lines which are well settled and need not be here described, the last of which (running about east southeast) is "a straight line to Polhemus' Mills, on the south branch of Kettle Creek." Up to this point there is no dispute. The statutory description proceeds: "thence, along the said creek, the several courses thereof, to the bay." The commissioners regarded this as calling for the middle line of Kettle Creek, and no complaint is made of that finding, nor of the selection for the end of this line of "a point halfway between the high water lines of Green Island Point and Drum Point at the mouth of Kettle Creek on Barnegat Bay." But the description laconically (and obscurely) proceeds: "thence across the bay to the sea: thence (northerly) along the sea to the place of beginning."

In attempting to ascertain the location and direction of the line "thence across the bay to the sea" the commissioners employed an engineer, went to the locality, heard testimony of several old residents, and did what fairly could be done by way of hunting up and locating alleged monuments and landmarks. Testimony from the old inhabitants was to the effect the line had always been regarded as a straight line

(and properly so as a matter of construction, see *Wharton* v. *Brick,* 49 *N. J. L.* 289), and that it had always been understood as passing across the southerly part of Ram Island, a little islet in Barnegat bay just off Normandy Harbor. For the township of Dover it was argued that the words "thence across the bay to the sea" meant the shortest straight line to the sea, and that this would fall by measurement, about one-half mile farther north on the sandspit than found by the commissioners. If we were deciding the absolute merits as commissioners, we would agree with them in preferring historical evidence of the old line as located, even the oral testimony of witnesses, to a geometrical solution based on the present shore line of the Atlantic ocean without regard to the location of that line in 1850. The finding of the commissioners establishing the line as running to a point on Ram Island is satisfactorily supported by the evidence. Of course there is an element of hearsay in it, but that is inevitable in an inquiry about an old boundary line, and within proper limits is an exception to the hearsay rule. *Wigm. Ev.,* § 1582. The case of *Curtis* v. *Aaronson,* 49 *N. J. L.* 68, is not to the contrary, as it related, and the rule laid down was restricted to private boundaries, and the testimony did not relate to general reputation, as in this case.

If the commissioners had continued their line eastward from Ram Island on the same course, that result would have been reasonable, logical and probably correct. But they were led astray by reasons of apparent expediency and from that point acted as legislators rather than as judges—a course warranted neither by the constitution nor the statute. They diverged their line a few degrees to the north to meet the end of the middle line of a block in Normandy Harbor, followed that line to the other end of that block, swerved again to pick up a similar middle line in Normandy Beach, and followed the latter line to the ocean. From a practical standpoint, the idea of avoiding the confusion of taxing single building lots in two townships had its admirable features, but such avoidance was a matter outside their jurisdiction, and in our estimation effectually vitiated the result

of their painstaking efforts. This, it is true, would be to the advantage of the township of Dover, the prosecutor, if the line to and through Ram Island be the true line; but as we are constrained to set aside the report and finding and proceedings thereon, the whole matter must be thrown open. There is another reason for setting aside the whole proceeding. The statute (*Pamph. L.* 1917, *pp.* 341, 342) requires the commissioners before they enter on the execution of their duties, to take and subscribe an oath, which, by section 3, is to be annexed to their report. The transcript by the stenographer indicates that they were sworn, but no oath seems to have been subscribed. As to this the transcript reads as follows: "(The commissioners' oath of office having been taken the form of oath will be typed and signed by the various commissioners as part of the record of the action of the commissioners.)" This was insufficient, and is enough, as we consider, to vitiate the report *in toto.* *Hoxsey* v. *Paterson,* 37 *N. J. L.* 409; *Anderson* v. *Myers,* 77 *Id.* 186, 190.

For this reason, and for the reason that the commissioners undertook to act as legislators and not as judges, the report and proceedings will be set aside but without costs. It seems needless to remark that the statutory ambiguity could be readily cured by suitable action of the legislature.